COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
 2-07-214-CV

 

 

IN THE INTEREST OF B.L.M., 

S.B.M., R.A.M., J.W.M.M., 

J.P.B.R., AND L.S.S.R.                                                                         

 

 

                                              ------------

 

            FROM
THE 367TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------








This is a parental-rights
termination case concerning six children. 
Appellant Bobbie H.Cthe biological mother of the childrenCchallenges the legal and factual sufficiency of the evidence to
support the jury=s section
161.001(1) and best-interest findings. 
Appellants Minnie B. and Rudolph B., pro seCBobbie=s mother and
her husbandCchallenge
the legal and factual sufficiency of the evidence to support the jury=s findings that Minnie and Rudolph should not be named managing
conservators of two of the children or possessory conservators of any of the
six children.  We affirm.

I.                   
Background

The following summary of the evidence will put the
issues into context.  We will discuss the
evidence in greater detail later in this opinion as it pertains to the
individual issues.

Bobbie is twenty-eight years old and the mother of
six children:  twins B.M. and S.M., age
eight; R.M., age five; J.M., age four; J.R., age three; and L.R., age two.[2]  School teachers, daycare workers, and medical
professionals made at least ten reports concerning the children=s welfare to the Department of Family
and Prospective Services (Athe
Department@) between
2003 and the time of trial.  Those
reports, and the Department=s
investigation of and response to same, included the following incidents.








In October 2004, the Department investigated a
report that S.M. had a black eye.  When
the Department and the Denton County Sheriff=s
Office went to the family=s
trailer home to investigate, they found the home in an unlivable
condition.  Michael Hendrix, a sheriff=s office investigator, testified that
the floor had holes in it, there was no running water, electricity was supplied
by an extension cord running from Rudolph and Minnie=s
trailer next door, the stove and heating unit were inoperable, and the family
shared the trailer with two cats and four dogs. 
Bobbie did, however, have a hotplate and an electric oven to prepare
meals.  The children had head lice, which
Bobbie was attempting to treat with mayonnaise and vinegar or alcohol, but she
was not treating the children=s
bedding or clothing.  The Department did
not remove the children; instead, it implemented a temporary safety plan under
which the children were to stay with Rudolph and Minnie while Bobbie repaired
the trailer; the Department paid for the repairs.  Bobbie and the children moved back into the
trailer when the repairs were complete. 








In August 2005, Bobbie took L.R.Cwho was two months old and had not seen
a doctor since birthCto
the health department.  L.R. had an
infection under his neck where baby formula had been allowed to build up.  Also, his fingernails were too long, allowing
him to scratch himself; the back of his head was flattened from lying on his
back excessively; and he had a bad diaper rash. The health department reported
L.R.=s
condition to the Department, and the Department placed L.R. and J.R. with
Rudolph and Minnie for thirty days. Department caseworker Dayana Alcazar
inspected Bobbie=s trailer
on August 12 and found it to be very dirty. 
Alcazar visited the home again on September 2 and found the trailer to
be very clean; but when she visited a third time on September 16, the condition
was not as good, and she found cat feces on the floor where L.R. was playing. 

In November 2005, Bonnie=s
electricity was cut off due to nonpayment, and she and the children moved into
Rudolph and Minnie=s
trailer, where they slept on a porch that had been converted into a
bedroom.  The small, windowless room was
heated by a space heater on a shelf, and Bobbie would smoke in the room with
the six children present.  Bobbie and the
children slept on a porch glider, two cribs, and a mattress on the floor.  Minnie testified that she slept in the room
with the children when Bobbie was working the night shift at the waffle house
where she was employed. 








On December 25, 2005, Bobbie took L.R. to the
hospital because he was having difficulty breathing.  L.R. was hospitalized with pneumonia, and the
hospital reported to the Department that Bobbie had been feeding L.R.
evaporated milk instead of formula. 
Department caseworker Michelle Hiza investigated the referral.  When Hiza went to the hospital, Bobbie was
not there; but Hiza was able to interview MinnieCwho
also happened to be hospitalized at the timeCand
Rudolph, who was sitting with L.R. 
Rudolph told her that he thought Bobbie was a very good mom and that he
had no concern about Bobbie=s
feeding L.R. a mixture of evaporated milk and water.  Likewise, Minnie told Hiza that she thought
Bobbie was a good mom and that she had no concerns about the children=s care. 
Hiza interviewed Bobbie the next day. 
Bobbie told her that she was feeding evaporated milk and water to L.R.
because he could not keep whole milk or formula 
down.  Hiza testified that Bobbie
was Aangry,
screaming, [and] yelling@
during the interview and used a lot of profanity.  When Bobbie stayed in the hospital with L.R.,
the nurses had to wake her up when L.R. was crying and ask her to take care of
him; on one occasion, Bobbie rolled over and went back to sleep.  When she fed L.R. in the hospital, she
sometimes propped L.R. up with a bottle so that he could feed himself. 

Further investigation by the Department revealed
the following information:

$                  
Dennis K., Bobbie=s
boyfriend, moved in with Bobbie and the children in December 2005.  Dennis had recently been released from prison
and had a history of assault and family violence.  The record is not clear about how long Dennis
lived with Bobbie.

 

$                  
When B.M. and S.M. began kindergarten, B.M.=s speech was unintelligible and she
communicated with grunts; S.M.=s
verbal skills were better but still below average for her age. 

 

$                  
B.M. and S.M. often went to school dirty and
wearing ill-fitting or inappropriate clothes and shoes. 

 








$                  
When Hiza visited R.M., B.M., and S.M. at
school, she found their speech unintelligible; she testified that they Areally had their own kind of language.@ 

 

$                  
Hiza also testified that R.M.=s stomach was distended and looked Avery unusual.@  Hiza later saw J.M. and J.R. and observed
that their stomachs also Akind
of protruded out.@ 

 








The Department removed all six children on January
3, 2006.  The trial court signed an order
implementing a service plan for Bobbie on January 27, 2006.  Bobbie completed a psychological evaluation
with Dr. Mark Foster, who testified that she functioned emotionally on the
level of a mid- to early adolescent.  Dr.
Foster recommended that she take anger management classes, but Bobbie did not
attend the classes.  The trial court
ordered Bobbie to attend weekly counseling sessions with therapist Michelle
Greer; Bobbie met with Greer six times then missed several appointments, cursed
at Greer over the phone, and refused to attend any more sessions.  Bobbie testified that she stopped attending
the sessions because she could not pay the fee Greer charged her for missed
sessions (the Department paid for the sessions Bobbie actually attended), but
Greer testified that she charged the missed-session fee in an attempt to make
Bobbie feel as though the therapy had value and that Bobbie refused to attend
any more sessions even after Greer offered to reduce the missed-session fee and
let Bobbie pay it out over time.  Bobbie
completed her MHMR assessment and participated in in-home parenting classes as
ordered; but CASA advocate Vicky Ulrich testified that the classes had no
effect on her parenting ability.  Bobbie
maintained housing and employment, but she stopped making child support
payments a year before trial. 

Bobbie visited the children regularly while all
six were in foster care in the Denton area. 
Department workers=
written descriptions of the visitations spotlight the Department=s concerns with Bobbie=s parental abilities:

$                  
Bobbie found a cup half-full of an unidentified
liquid in the conference room where the visitation occurred; she emptied the
cup andCwithout
washing itCfilled it
with apple juice; all of the children shared the cup for the duration of the
visit; 

 

$                  
She lifted L.R. off the floor by one wrist to
stop him from pushing J.R.=s
chair; 

 

$                  
When J.R. attempted to walk out of the
visitation room, she grabbed him by the wrist and pushed him to the floor; 

 

$                  
She frequently Ayelled
and screamed@ at
Department workers during the visits; 

 

$                  
She Amade
a big deal about the children eat[ing] all the sugar so they could be >hyper=
when they go back@ to their
foster homes; 

 

$                  
She did not attempt to redirect the children
when they engaged in inappropriate behavior, such as climbing on cabinets,
playing with electrical outlets, and taking toys from one another; 

 

$                  
She allowed the children to listen to sexually
suggestive song lyrics on her cell phone; 

 








$                  
She lifted L.R. by his upper arm and argued with
a Department worker who told her that lifting L.R. that way might dislocate his
shoulder; a few minutes later, she jerked J.R. by his upper arm; 

 

$                  
She mocked J.R. by screaming at him when J.R.
cried or lost his temper; and 

 

$                  
She sometimes arrived late and twice left one
hour into the two-hour visitation. 

 

After the four older children were placed with
relatives in Wichita Falls, Bobbie visited them only three times in a ten-month
period.  Bobbie testified that she could
not visit the children in Wichita Falls because her truck broke down, but she
also testified that her mother would provide transportation for the
visits.  The children=s foster father testified that on one
visit in Wichita Falls, Bobbie spent thirty or forty minutes with the children,
then left to meet with friends.  The two
younger children remained in foster care in Denton, and although Bobbie was
scheduled to visit them twice a month, she visited them only six times in the
ten months following July 2006. 








At trial, Bobbie testified, AI don=t
want my children back with me.  I can=t take care of them@ and AI
just want visitation.@  The jury found that Bobbie had violated
subsections (D), (E), (N), and (O)[3]
of family code section 161.001(1); that termination of Bobbie=s parental rights was in the children=s best interest; that the Department
should be named as permanent managing conservator of J.R. and L.R.; and that
Rudolph and MinnieCwho
intervened in the termination proceedingCshould
not be named possessory conservators of any of the children.  The trial court terminated Bobbie=s parental rights and appointed the
Department as the children=s
permanent managing conservator.  This
appeal followed.

XVII.     
Termination of Bobbie=s
parental rights

A.                
Standard of review








A parent=s rights to Athe
companionship, care, custody, and management@ of his or her children are constitutional interests Afar more precious than any property right.@  Santosky v. Kramer, 455
U.S. 745, 758-59, 102 S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d
534, 547 (Tex. 2003).  In a termination
case, the State seeks not just to limit parental rights but to end them
permanentlyCto divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right to inherit.  TEX. FAM. CODE ANN. ' 161.206(b) (Vernon Supp. 2007); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly
scrutinize termination proceedings and strictly construe involuntary
termination statutes in favor of the parent. 
Holick, 685 S.W.2d at 20-21; In re E.M.N., 221 S.W.3d 815,
820 (Tex. App.CFort Worth
2007, no pet.).

In proceedings to terminate
the parent‑child relationship brought under section 161.001 of the family
code, the petitioner must establish at least one ground listed under
subdivision (1) of the statute and must also prove that termination is in the
best interest of the child.  TEX. FAM. CODE ANN. ' 161.001 (Vernon Supp. 2007); In re J.L., 163 S.W.3d 79,
84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact. 
Tex. Dep=t of Human
Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).








Termination of parental
rights is a drastic remedy and is of such weight and gravity that due process
requires the petitioner to justify termination by clear and convincing
evidence.  TEX. FAM. CODE ANN. '' 161.001, 161.206(a); In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002).  This intermediate standard
falls between the preponderance standard of ordinary civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); In re C.S., 208 S.W.3d 77, 83 (Tex. App.CFort Worth 2006, pet. denied). 
It is defined as the Ameasure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.@  Tex.
Fam. Code Ann. ' 101.007
(Vernon 2002).

When reviewing the evidence
for legal sufficiency in parental termination cases, we must determine whether
the evidence is such that a fact-finder could reasonably form a firm belief or
conviction that the grounds for termination were proven.  In re J.P.B., 180 S.W.3d 570, 573
(Tex. 2005).  We must review all the
evidence in the light most favorable to the finding and judgment.  Id. 
This means that we must assume that the fact-finder resolved any
disputed facts in favor of its finding if a reasonable fact-finder could have
done so.  Id.  We must also disregard all evidence that a
reasonable fact-finder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable fact-finder could, and disregard contrary evidence unless a
reasonable fact-finder could not.  Id.

We must therefore consider
all of the evidence, not just that which favors the verdict.  Id.  But we cannot weigh witness credibility issues
that depend on the appearance and demeanor of the witnesses, for that is the
fact-finder=s
province.  Id. at 573, 574.  And even when credibility issues appear in
the appellate record, we must defer to the fact-finder=s determinations as long as they are not unreasonable.  Id. at 573.








When reviewing the evidence
for factual sufficiency, we must give due deference to the fact-finder=s findings and not supplant the verdict with our
own.  In re H.R.M., 209 S.W.3d
105, 108 (Tex. 2006).  We must determine
whether, on the entire record, a fact-finder could reasonably form a firm
conviction or belief that the parent violated the relevant conduct provision of
section 161.001(1) and that the termination of the parent=s parental rights would be in the best interest of the child.  In re C.H., 89 S.W.3d 17, 28 (Tex.
2002).  If, in light of the entire
record, the disputed evidence that a reasonable fact-finder could not have
credited in favor of the finding is so significant that a fact-finder could not
reasonably have formed a firm belief or conviction in the truth of its finding,
then the evidence is factually insufficient. 
H.R.M., 209 S.W.3d at 108.

B.                
Analysis

1.                 
Grounds for termination: Endangerment








In her first and second issues, Bobbie challenges
the legal and factual sufficiency of the evidence to support the jury=s findings under family code section
161.001(1)(D) and (E).  Subsection (D)
authorizes termination if a parent knowingly placed or knowingly allowed the
child to remain in conditions or surroundings that endanger the child=s physical or emotional well-being, and
subsection (E) authorizes termination if a parent engaged in conduct that
endangers the child=s
physical or emotional well-being.  Tex. Fam. Code Ann. ' 161.001(1)(D), (E).

Endangerment means to expose
to loss or injury, to jeopardize.  Boyd,
727 S.W.2d at 533; see also In re M.C., 917 S.W.2d 268, 269 (Tex. 1996).
Under subsection (D), it is necessary to examine evidence related to the
environment of the child to determine if the environment was the source of
endangerment to the child=s physical
or emotional well-being.  In re D.T.,
34 S.W.3d 625, 633 (Tex. App.CFort Worth 2000, pet. denied). 
Conduct of a parent in the home can create an environment that endangers
the physical and emotional well‑being of a child.  In re W.S., 899 S.W.2d 772, 776
(Tex. App.CFort Worth
1995, no writ).  For example, abusive or
violent conduct by a parent or other resident of a child=s home may produce an environment that endangers the physical or
emotional well‑being of a child.  See
id. at 776B77; Ziegler
v. Tarrant County Child Welfare Unit, 680 S.W.2d 674, 678 (Tex. App.CFort Worth 1984, writ ref=d n.r.e.). 








Under subsection (E), the
relevant inquiry is whether evidence exists that the endangerment of the child=s physical well-being was the direct result of the parent=s conduct, including acts, omissions, or failures to act.  In re R.D., 955 S.W.2d 364, 368 (Tex.
App.CSan Antonio 1997, pet. denied); Dupree v. Tex. Dep=t of Protective &
Regulatory Servs., 907 S.W.2d 81, 83-84 (Tex. App.CDallas 1995, no writ). 
Additionally, termination under section 161.001(1)(E) must be based on more
than a single act or omission; a voluntary, deliberate, and conscious course of
conduct by the parent is required.  Tex. Fam. Code Ann. ' 161.001(1)(E); D.T., 34 S.W.3d at 634; In re K.M.M.,
993 S.W.2d 225, 228 (Tex. App.CEastland 1999, no pet.).  Under
either subsection (D) or (E), it is not necessary that the parent=s conduct be directed at the child or that the child actually suffer
injury.  Boyd, 727 S.W.2d at
533.   

Because the evidence
concerning these two statutory grounds for termination is interrelated, we
consolidate our examination of it.  See In re J.T.G, 121 S.W.3d 117, 126 (Tex.
App.CFort Worth 2003, no pet.); 
In re B.R., 822 S.W.2d 103, 106 (Tex. App.CTyler 1991, writ denied) (recognizing the link between a parent=s conduct and a child=s conditions and surroundings). 
   The Department=s brief recites a litany of facts and circumstances that support the
jury=s endangerment findings, as follows:

$                  
The children were seen eating dog food off the
floor of Bobbie=s
home in February 2003; 

 

$                  
Her home had old dog food matted into the carpet
in September 2003; 

 

$                  
There were two large holes in the home=s
floor, which a sheriff=s
investigator testified were a hazard to the children in October 2004; 








 

$                  
In October 2004, the home had no running water,
the stove was disconnected, and electricity was supplied via a power cord
connected to Rudolph and Minnie=s residence next door, and
the Department declared the home unlivable; 

 

$                  
According to Bobbie, the children bathed at
Minnie=s
house, but during the Department=s investigation, Minnie was
out of town, the house was locked, and Bobbie and the children had no access to
water; 

 

$                  
In December 2005, Bobbie and the children were
living on the enclosed porch of her mother=s trailer;

 

$                  
The children were not clean when attending
daycare, and daycare staff had to bathe them; 

 

$                  
Bobbie took J.M. to daycare with dirty bottles; 

 

$                  
J.R. fell off Bobbie=s bed
when he was two weeks old; 

 

$                  
The children repeatedly had head lice; 

 

$                  
When she began kindergarten, B.M. could not speak
and communicated by grunting; her twin, S.M., could speak, but was behind for
her age; they were often dirty and inappropriately clothed; and B.M. had to
repeat kindergarten; 

 

$                  
L.R. had an infection on his neck from formula
build-up, a flat head from being left on his back excessively, and scratched
himself with overlong fingernails; 

 

$                  
The sheets on the children=s
beds were dirty; 

 

$                  
B.M. appeared to be dehydrated at school; 

 

$                  
Bobbie was unable to afford formula for L.R. and
failed to maintain her WIC coverage; 

 








$                  
Bobbie failed to maintain Medicaid coverage for
the children; 

 

$                  
Bobbie exhibited an unwillingness or inability to
care for L.R. when he was hospitalized; 

 

$                  
In January 2006, Bobbie=s
home was dirty and had feces on the floor; garbage and cigarettes were
accessible to the children; and the dishwasher had no front cover and was a
hazard to the children; 

 

$                  
When Department caseworker Hiza visited R.M.,
B.M., and S.M. at school, they were filthy; 

 

$                  
Bobbie refused to let the Department have J.R.=s
hair cut, even though the hair would stick to his face because of the food and
mucus in it; and

 

$                  
In December 2005, Bobbie allowed Dennis K.Cwho
had just been released from prison after serving a sentence for family violence
and assault with a deadly weaponCmove into her home; Bobbie
testified that Dennis did not move in with her until after the Department
removed the children from her home, but he was living with her at the time of
trial.  Also at the time of trial, Dennis
was under indictment for a drug charge and a family violence assault
charge.   

 

Bobbie also exhibited
potentially endangering behavior during supervised visitations with the
children after the Department removed them from her home, including the
following:

$                  
During one visitation, BobbieCwho
was talking on her cell phoneCgrabbed J.R. by the wrist and
pushed him back into the visitation room; J.R. hit his head on the television
stand; 

 








$                  
On one occasion, Bobbie found a half-filled cup
by the sink in the visitation room; she poured its contents down the sink,
filled the cup with apple juice, and let all six children drink out of it for
the duration of the visit; 

 

$                  
All Bobbie provided for the children=s
lunch during one visit was a loaf of white bread; 

 

$                  
On one occasion, Bobbie lifted L.R. by one wrist;
on another occasion, she lifted him over a chair by one arm; 

 

$                  
Bobbie allowed the children to play with
potentially dangerous objects during the visitations, such as electrical
outlets, and left the baby, L.R., on the floor where he could get knocked over
by the other children. 

 

Bobbie argues that while at
times her home was dirty and her children were unkempt and had head lice, at
other times her home and children were relatively clean.  But a more accurate assessment of the record  showsCas the State arguesCthat conditions would improve while the Department was actively
involved in Bobbie=s life, then
deteriorate when its involvement ended.

Viewing all of the evidence
in the light most favorable to the verdict, we hold a fact-finder could
reasonably form a firm belief or conviction that Bobbie endangered the
children.  See In re J.P.B., 180
S.W.3d at 573.  Thus, the evidence is
legally sufficient to support the jury=s findings that Bobbie violated family code sections 161.001(1)(D) and
(E).  We further hold that the evidence
is factually sufficient to support the findings.  See In re C.H., 89 S.W.3d at 28.  We overrule Bobbie=s first and second issues.








Having determined that the
evidence is legally and factually sufficient to support the jury=s findings under sections 161.001(1)(D) and (E), we do not reach her
third and fourth issues, in which she argues that the evidence is legally and
factually insufficient to support the jury=s findings under sections 161.001(1)(N) and (O).  See Tex.
R. App. P. 47.1; In re J.L., 163 S.W.3d at 84; In re E.M.N.,
221 S.W.3d 815, 821 (Tex. App.CFort Worth 2007, no pet.). 

1.                 
Best interest

In her fifth issue, Bobbie challenges the legal
and factually sufficiency of the evidence to support the jury=s findings that termination is in the
children=s best
interest.        Prompt and permanent placement of the child in a safe environment
is presumed to be in the child=s
best interest.  Tex. Fam. Code Ann. ' 263.307(a) (Vernon 2002).  There is also a strong presumption that
keeping a child with a parent is in the child=s
best interest.  In re R.R., 209
S.W.3d 112, 116 (Tex. 2006). 
Nonexclusive factors that the trier of fact in a termination case may
use in determining the best interest of the child include:

(1)        the desires of the child;

 

(2)        the emotional and physical needs of the child now and in the
future;

 

(3)        the emotional and physical danger to the child now and in the
future;

 

(4)        the parental abilities of the individuals seeking custody; 








(5)        the programs available to assist these individuals to promote
the best interest of the child;

 

(6)        the plans for the child by these individuals or by the agency
seeking custody;

 

(7)        the stability of the home or proposed placement;

 

(8)        the acts or omissions of the parent which may indicate that
the existing parent‑child relationship is not a proper one; and

 

(9)        any excuse for the acts or omissions of the parent.

 

Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex. 1976).

These factors are not exhaustive; some listed
factors may be inapplicable to some cases; other factors not on the list may
also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.













Michelle Greer, a therapist with whom Bobbie
attended six counseling sessions as a part of her service plan,[4]
testified that Bobbie was not concerned with the children=s condition when the Department removed
them from her home and therefore did not feel that she needed to make any
changes in the way she cared for them. 
UlrichCthe CASA
advocateCtestified
that Bobbie did not comply with techniques that were taught in the parenting
class that Bobbie took, and the class seemed to have no effect on her
progress.  Ulrich testified that Bobbie
never accepted responsibility for her children=s
removal and that her refusal to do so was a Ahuge
problem@ because Aif you don=t
think that there=s a
problem, you can=t fix it.@ 
Department conservatorship worker Amie Fletcher testified that Bobbie
failed to exhibit adequate parenting skills during supervised visitations and
showed no improvement after her parenting classes. Conservatorship worker
Shelby Johnson testified that Bobbie expressed an overall lack of interest in
raising the children and providing for their basic needs.       After
removing the children from Bobbie=s
home, the Department eventually placed J.M., R.M., S.M., and B.M. with David
and Georgia G., who are relatives of their biological father, Sherman M.[5]  When David and Georgia received the children,
J.M. and R.M. did not know how to feed themselves and S.M. and B.M. had no
concept of how to brush their teeth. 
Amie Fletcher testified that the children=s
behavior improved while they lived with David and Georgia.  David testified that the children are happy,
laughing, and playing.  The four children=s clarity of speech has improved.  Ulrich testified that the children have made
good progress after being placed with David and Georgia, and David said that
the children are performing school work far above the level at which they
performed when they were removed from Bobbie=s
home.  David said that he and Georgia are
prepared to raise the four children until their father is able to care for
them, or until adulthood otherwise. 

J.R. and L.R. have been with a foster family since
April 6, 2006.[6]  Their foster mother testified that when the
family received the children, J.R. communicated by screaming, pointing, and
grunting; after twice-a-month speech therapy sessions, J.R. can now speak.  L.R. was on 
medications for breathing problems and projectile vomiting, but he is
now medication free. Fletcher noted that the shape of L.R.=s head has improved and attributes his
weight gain to a diet of formula instead of evaporated milk.  J.R. and L.R.=s
foster mother said that she and her husband are committed to adopting the
children.   








Considering the evidence in light of the
applicable Holley factors and under the appropriate standards of review,
we hold that the evidence is both legally and factually sufficient to support
the jury=s
findings that termination of Bobbie=s
parental rights is in the best interest of each of the children.  See Holley, 544 S.W.2d at 371B72; In re J.P.B., 180 S.W.3d at
573; In re C.H., 89 S.W.3d at 28. 
We overrule Bobbie=s
fifth issue.

XLIV.   
Ruldolph and Minnie=s
issues[7]

In their first and second issues, Rudolph and
Minnie challenge the legal and factual sufficiency of the evidence to support
the jury=s
findings that the Department, rather than Rudolph and Minnie, should be named
as the permanent managing conservators for J.R. and L.R. and that Rudolph and
Minnie should not be named as possessory conservators of any of the six
children.  In their third issue, they
argue that the evidence is legally and factually insufficient to show that the
jury=s
findings are in the children=s
best interest.








Under family code section 153.005, a trial court
may appoint a sole managing conservator or joint managing conservators.  Tex.
Fam. Code Ann. '  153.005(a) (Vernon Supp.
2007).  Section 153.006 allows a trial
court to appoint one or more possessory conservators if it appoints a managing
conservator.  Id. ' 153.006 (Vernon Supp. 2007).  AThe
best interest of the child shall always be the primary consideration of the
court in determining the issues of conservatorship and possession of and access
to the child.@  Id. ' 153.002
(Vernon Supp. 2007).  When determining
matters of conservatorship, courts may apply the Holley factors to
determine the child=s best
interest. See Blackwell v. Humble, 
241 S.W.3d 707, 723 (Tex. App.CAustin
2007); Vazquez v. Vazquez, No. 14‑05‑01257‑CV, 2007 WL
1745324, at *3 (Tex. App.CHouston
[14th Dist.] June 19, 2007, no pet. h.); In re M.A.M., 35 S.W.3d 788,
790 (Tex. App.CBeaumont
2001, no pet.) (all applying Holley factors to conservatorship issues).

In a jury trial, a trial court may not render an
order in contravention of the jury=s
findings.  Tex. Fam. Code Ann. ' 105.002(c)(1)(A) (Vernon Supp. 2007).  We review jury findings underlying a
conservatorship appointment under the ordinary legal and factual sufficiency
review, not under the Aclear and
convincing@ standard
applicable to termination proceedings.  In
re J.A.J.,  2007 WL 3230169, at *6
& n.5 (Tex. 2007).  








We may sustain a legal sufficiency challenge only when (1)
the record discloses a complete absence of evidence of a vital fact; (2) the
court is barred by rules of law or of evidence from giving weight to the only
evidence offered to prove a vital fact; (3) the evidence offered to prove a
vital fact is no more than a mere scintilla; or (4) the evidence establishes
conclusively the opposite of a vital fact. 
Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334 (Tex.
1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, ANo Evidence@ and AInsufficient
Evidence@ Points of
Error, 38 TEX. L. REV. 361, 362B63 (1960).  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable fact-finder could and
disregard evidence contrary to the finding unless a reasonable fact-finder
could not.  City of Keller v. Wilson,
168 S.W.3d 802, 807, 827 (Tex. 2005). 

An assertion that the
evidence is factually insufficient to support a fact finding means that the
evidence supporting the finding is so weak or the evidence to the contrary is
so overwhelming that the answer should be set aside and a new trial
ordered.  Garza v. Alviar, 395
S.W.2d 821, 823 (Tex. 1965).  We are
required to consider all of the evidence in the case in making this
determination, not just the evidence that supports the finding.  Mar. Overseas Corp. v. Ellis, 971
S.W.2d 402, 406-07 (Tex.), cert. denied, 525 U.S. 1017 (1998).








In addition to the evidence
recounted above, Rudolph and Minnie point to the following evidence in support
of their legal and factual insufficiency issues.  Minnie testified that Bobbie and the children
always had access to the bathroom and running water in Minnie=s trailerCeven when
Minnie and Rudolph were out of town because they would leave the trailer
unlocked.  Registered nurse Kim Frenette
testified that when L.R was in the hospital, Minnie helped Frenette care for
L.R., appeared concerned about his well-being, held him, and fed him his
bottle.  Minnie testified that when the
school called her about the children=s lice infestation, she treated their hair with a commercial lice
treatment and that they never had lice when they were living in her home.  David G. and Department workers Shelby
Johnson and Amie Fletcher testified that Minnie=s visits with the children were Aappropriate@ and that
Minnie was Anurturing.@  Minnie also provided food for
the children during visitations and made clothing for them for Christmas and
Easter. 








The Department notes that
Johnson also testified that Minnie Awas very quick to make excuses@ for Bobbie when Bobbie acted inappropriately during visitations and
that the lives of the children did not improve while Minnie was involved unless
the Department was also actively involved. 
Minnie and Rudolph told Department caseworker Hiza that they had no
concerns about Bobbie=s parenting
ability.  Minnie testified that she and
Randolph were financially unable to furnish formula for L.R. when Bobbie was
feeding him evaporated milk.  When asked
how she could afford to take a vacation but not help provide necessities for
the children, Minnie testified that it was not her responsibility to provide
for them. 

Considering all of the
evidence in the light most favorable to the jury=s verdict on managing and possessory conservatorship, we hold that
there is not a complete lack of evidence of a vital fact and that the evidence
does not conclusively establish the opposite of a vital fact; thus, the
evidence is legally sufficient to support the jury=s verdict.  See Uniroyal Goodrich
Tire Co., 977 S.W.2d at 334.  Nor is the evidence supporting the verdict so
weak or the evidence to the contrary so overwhelming that the answer should be
set aside and a new trial ordered; thus, the evidence is factually sufficient.  See Garza, 395 S.W.2d at 823.  Therefore, we overrule Rudolph and Minnie=s first three issues.








In their fourth issue,
Rudolph and Minnie argue that their retained trial counsel rendered ineffective
assistance by failing to cross-examine the physician who treated L.R., failing
to offer photographs of the children and medical records pertaining to J.R. as
evidence, and failing to call Rudolph to testify. 
In Texas, there is a statutory right to counsel for indigent parents in
parental‑rights termination cases, and this right embodies the right to
effective counsel.  In re M.S.,
115 S.W.3d at 544; see Tex. Fam.
Code Ann. ' 107.013(a)(1) (Vernon Supp.
2007).  But the statute provides that
this right only applies to the parents of the child that is the subject of the
termination.  In re J.S., No. 02‑04‑00277‑CV,
2005 WL 1693537, at *5 (Tex. App.CFort Worth July
21, 2005, no pet.) (mem. op.).  Rudolph
and Minnie cite no authority to support their claim that a grandparent
intervenor in a parental termination suit has a constitutional or statutory
right to effective assistance of counsel. 
Because they had neither a constitutional nor statutory right to
counsel, they cannot raise a claim of ineffective assistance of counsel, and we
overrule their fourth issue.  See id.
(holding great-grandparent intervenor who sought to be appointed managing
conservator of child had no constitutional or statutory right to counsel and
could not raise ineffective-assistance claim on appeal).

Rudolph and Minnie=s fifth issue is A[w]hether there is
a legal ruling about person #1 questioning person #2 in a hospital and person
#2 is taking pain medication.@  Their entire argument under this issue
comprises the following two sentences: AMichelle Hiza,
TDFPS case worker, in January 2006, interviewed [Minnie] at the hospital.  She stated that [Minnie] was a patient at the
hospital.@ 








An issue on appeal unsupported by argument or citation to
any legal authority presents nothing for the court to review.  Strange v. Cont=l Cas. Co., 126 S.W.3d 676,
678 (Tex. App.CDallas 2004, pet. denied), cert. denied,
543 U.S. 1076 (2005).  Further, Awe know of no
authority obligating us to become advocates for a particular litigant through
performing their research and developing their argument for them.@  Tello v. Bank One, N.A., 218
S.W.3d 109, 116 (Tex. App.CHouston [14th
Dist.] 2007, no pet.).  Thus, an
inadequately briefed point may be waived on appeal.  Hall v. Stephenson, 919 S.W.2d 454,
467 (Tex. App.CFort Worth 1996, writ denied); see also
Fredonia State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284B85 (Tex. 1994)
(discussing Along-standing rule@ that point may be
waived due to inadequate briefing). 

Rudolph and Minnie=s fifth issue is
unsupported by argument or citation to any legal authority; moreover, we cannot
even discern from the issue statement what complaint they intended to
raise.  Therefore, we overrule their
fifth issue as inadequately briefed.

XLV.      
Conclusion

Having overruled Bonnie=s
first, second, and fifth issues and all of Rudolph and Minnie=s issues, and not having reached Bonnie=s third and fourth 

 

 








 

issues, we affirm the trial court=s
order terminating Bonnie=s
parental rights and appointing the Department as the children=s permanent managing conservator.

 

 

ANNE GARDNER

JUSTICE

 

PANEL F:        CAYCE, C.J.; GARDNER and MCCOY, JJ.

 

DELIVERED:
April 24, 2008











[1]See Tex. R. App. P. 47.4.





[2]Sherman
M. is the father of the four older children, and Stephen R. is the father of
the two younger children.  Stephen did
not appear or otherwise respond to the Department=s
petition to terminate his parental rights, and the trial court terminated his
rights.  The Department did not seek to
terminate Sherman=s
parental rights. 





[3]The
jury=s
findings on subsections (D), (E), and (N) were unanimous.  The jury split eleven to one on the
subsection (O) findings with regard to each child.





[4]Greer
testified that after six appointments, Bobbie got angry, cursed at Greer over
the phone, and told Greer that she would not attend counseling any longer. 





[5]The
children were in other foster homes between the time of removal and the time of
placement with David and Georgia.





[6]Like
their siblings, J.R. and L.R. were in other foster homes before being placed in
the home where they were living at the time of trial.





[7]Ruldolph
and Minnie attached as appendices to their brief several documents that do not
appear in the record.  We cannot consider
documents attached to an appellate brief that do not appear in the record.  Till v. Thomas, 10 S.W.3d 730, 733
(Tex. App.CHouston
[1st Dist.] 1999, no pet.).  This court
must hear and determine a case based on the record as filed and may not
consider documents attached as exhibits to briefs.  Id.